UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BioLumix, Inc., a Michigan corporation,
Gideon Eden, an individual, and Ruth          Case No. 08 - 11418
Eden, an individual, jointly and severally

    Plaintiffs/Counterclaim-Defendants

                                      Hon. Arthur J. Tarnow
         v.                             U.S. District Judge
                                      Hon. James F. Davis
                                      Special Master/Arbitrator

Centrus International, Inc.,

    Defendant/Counterclaim-Plaintiff

                  * * * * * * * * * * * * * * * *

### SPECIAL MASTER'S ORDER RE DEFENDANT/COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT RE BREACH OF CONTRACT AND CONVERSION CLAIMS

      Defendant/Counterclaim Plaintiff Centrus International Inc., pursuant to Rule 56 F.R.Civ.P., moves for summary judgment on three counts of Plaintiffs' Second Amended Complaint (Counts VIII, IX and X) relating to allegations of breach of contract. Centrus also moves for summary judgment on four counts (30, 33, 35 and 36) in its First Amended Counterclaim relating to alleged conversion (statutory and common law) and for breach of contract by the Eden plaintiffs.

      The motions relate to a series of contracts between (a) the Eden plaintiffs and (b) Centrus and certain predecessor companies. Between 1999 and 2006, plaintiffs Drs. Gideon and Ruth Eden entered into at least 10 interrelated

1

contracts with Centrus and its predecessors, including BioSys Inc. which the Edens founded. The contracts deal with rights and obligations of the parties regarding intellectual property created by the Edens. Plaintiffs characterize the contracts as "often inartfully drafted" and "sometimes internally inconsistent". However characterized, the relationship between and among the contracts must be understood to determine the parties' rights and obligations. To that end, this ruling on motions is necessarily addressed.

*The 1999 and 2002 contracts*

Drs. Gideon and Ruth Eden are scientists engaged in development of microbiological testing technology. On June 9, 1999, they founded BioSys, Inc. to develop and market such technology. Gideon was Chairman of the Board; Ruth, Chief Executive Officer. Effective June 21, 1999, the Edens entered a contract as individuals with BioSys (called Assignment Agreement, herein the "1999 contract"). The 1999 contract assigned to Biosys ownership of 5 patents and patent applications together with "certain trademarks and trade names, trade secrets and proprietary know-how relating to the inventions, and copyrights in works of authorship relating to the inventions (all of which will be referred to . . . as the 'Properties')" listed in a "Schedule A." The Edens were the inventors of the patents and patent applications as well as the owners. BioSys in return agreed to "raise at least $400,000 in cash" and to "pay royalties" to the Edens, essentially "one percent of its annual gross sales".

Furthermore, the 1999 contract provides that "the Edens shall assign, without payment of any additional royalties or other compensation by BioSys, any improvements that the Edens may make to the inventions included in the Properties. Such improvements will be treated as if they had been among the assigned Properties from the effective date of this Agreement." The 1999 contract was signed on behalf of BioSys by "Gerald Moore, President."

About 3 years later, effective March 19, 2002, the Edens and BioSys entered into a second agreement called a "Clarification of Patent Assignment Agreement [i.e. the 1999 contract]". The 2002 Clarification Agreement was signed on behalf of BioSys by its then-President Brian Leek. It is not clear on the present

2

record what considerations motivated the 2002 Clarification Agreement but its terms include the following:

(1) The 1999 contract was expressly stated to be "the only agreement recognized by the Edens and BioSys relating to the assignment of certain intellectual property (identified in Schedule A to the Assignment Agreement) and all other assignment agreements whether dated before or after the Assignment Agreement, are void and of no effect."

(2) Schedule A was "updated" and "amended" in a so-called "Appendix II".

(3) The Edens agreed to "sign and deliver" to BioSys "the Assignment of Issued U.S. Patents and Assignment of U.S. Origin Patent Applications" which are attached hereto as "Appendix III."

(4) BioSys agreed to deliver to the Edens a "two-year promissory note . . . in the principal amount of $117,621.51 which represents all past due royalties . . .", among other things, which "cures all defaults of BioSys prior to the date of this agreement."

(5) In a long and complex paragraph 7 in the 2002 Clarification Agreement, the parties provided: "In order to assure his continuing participation in the success of BioSys, Mr. Eden hereby agrees that, so long as Ruth Eden is employed by BioSys, all inventions in microbiology that he creates that relate, or could relate, to BioSys' present or future product line, including but not limited to improvements, corrections, enhancements and new versions of the BioSys technology, as well as products under development . . . will be first offered to BioSys on royalty terms substantially similar to those in the Assignment Agreement [ i.e. the 1999 contract]. BioSys may exercise its first right to refuse and enter into an assignment agreement within 60 days following the offer date."

*Centrus' contentions*

3

Ultimately, Centrus became successor in interest to the 1999 contract and the 2002 Clarification Agreement by merger with BioSys. As such, Centrus contends that plaintiffs have breached the contracts with Centrus by unlawfully incorporating in plaintiffs' competing BioLumix device the technology, improvements and proprietary know-how here at issue.  As Centrus puts it, plaintiffs are "profiting from the very technology, improvements and know-how that they previously contractually assigned and sold to Centrus in breach of their unambiguous contractual obligations."  Centrus puts to one side the question whether plaintiffs infringe any of the Centrus' patents, stating "to resolve this Motion, the Court does not need to address whether the patents have been infringed, or find the devices identical in every way. Having broadly assigned the technology and all related know-how and improvements [to Centrus through BioSys], the question is simply whether the BioLumix System is *derived from or based upon* the technology or related know-how or represents any *improvement* thereon." [Emphasis supplied]

At the outset, the contracts do not define the terms "proprietary know-how," "improvements" or "technology" within the meaning of the contracts.

(1) Neither plaintiffs' BioLumix device nor Centrus' Soleris device are yet of record in this case. Obviously they must be in due course. Without detailed knowledge of the devices and their development, only limited insight can be gleaned to what extent the BioLumix device in its final form was "derived from or based upon" information pertinent to the contract provisions of "proprietary know-how" and "improvements."

In its reply brief, Centrus notes two Eden patent applications (US 2008/0176273A1 and US 2010/0273209A1) and asserts that they "identify the BioLumix device". To date however, no evidence supports the assertion that those patent applications disclose the BioLumix device as marketed.

(2) As to "proprietary know-how", Centrus apparently agrees that it is not defined in the contracts nor in Centrus' submissions here. Furthermore, Centrus

4

does not purport to separate "know-how" that was arguably considered "proprietary" by BioSys from what was not, at the time of the Bio-Sys development work. This of course is important because the undisputable law of intellectual property recognizes that some industrial "know how" may be "proprietary" and protectable, some not, depending upon the confidentiality with which it is treated. Centrus does not address that consideration.

Interestingly, in a Confidentiality Agreement between Gideon Eden and Biosys, Inc. entered March 19, 2002 concomitantly with the 2002 Clarification Agreement, the parties addressed "Confidential Information" of each party and how to deal with it. They defined "Confidential Information" to include "information or material disclosed by one party . . . to the other party . . . *followed by a letter within 15 days of disclosure describing the Confidential Information, including . . . matters of a technical nature including inventions"*.(Emphasis supplied). "Inventions" expressly included "know-how". By thus so requiring a written description, the agreement shows that the parties recognized the importance of identifying confidential, i.e. proprietary," know-how" with certainty.

(3) As to "improvements", Centrus says that the BioLumix and Soleris devices are not "identical in every way" but considers them "equivalent". Furthermore, Centrus considers the BioLumix device to be an "improvement" and thus the BioLumix technology is owned by Centrus under the 1999 contract.

But the contracts, says plaintiffs, are at least "ambiguous" in this regard. Read alone, the 1999 contract, paragraph 4, arguably supports Centrus. Plaintiffs apparently agree. But, says plaintiffs, the 2002 Clarification Agreement modifies the 1999 contract, paragraph 7 providing a "first right to refuse" regarding "all inventions in microbiology that he [Mr. Eden] creates that relate, or could relate, to BioSys' present or future product line, including but not limited to, *improvements*, corrections, enhancements and new versions of the BioSys technology . . .". (Emphasis supplied). If BioSys refused to exercise its right to take assignment of an invention (including "improvements") as set out in paragraph 7, then Mr. Eden was "free" to "develop" and "exploit" it on his own,

5

notwithstanding "any covenant not to compete with BioSys that may be contained in any other agreement."

In short, as understood, paragraph 4 of the 1999 contract and paragraph 7 of the Clarification Agreement create ambiguity in how the parties intended to treat "improvements". Extrinsic evidence may (or may not) shed light on the parties' intentions here. In any event, the issue is not ripe for summary judgment.

*The 2004 contracts*

In July, 2004, Gideon Eden and BioSys entered four contracts, called Assignment Agreements, relating to four new technologies being developed by Eden --- Fluorescence (July 18); Air Sampler (July 18); Network System (July 20); and Telephone Alarm System(July 21). The technologies were each the subject of patents or patent applications. Eden assigned the technologies, including the patents and patent applications, to BioSys. BioSys in turn agreed to "develop the specific industrial microbiological applications" of each of the technologies and "to pay royalties" to the Edens under "existing agreements between the parties." BioSys also agreed to "provide Gideon Eden at no charge with a non-revocable exclusive license" to the technologies "for non-industrial microbiological applications."

Plaintiffs contend that BioSys (and its successor Centrus) breached the agreements by refusing to grant the licenses (Count IX) and by failing to develop the technologies for specific industrial microbiological applications. (Count X ). Centrus denies the breaches claiming that the four July 2004 Assignment Agreement contracts were "superseded" by a later August 2004 contract which left the July contracts "void and of no effect".

The August 2004 contract, called AMENDMENT TO INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (hereafter the "August 2004 Agreement") was an agreement amending the earlier 1999 contract and 2002 Clarification

6

Agreement. Among other things, the August 2004 Agreement added the four July 2004 Assignment Agreements to Schedule A in the 1999 contract and the 2002 Clarification Agreement. Centrus argues that by doing so, the August 2004 Agreement voided the four July 2004 contracts because, as understood, (a) the governing 2002 Clarification Agreement does not "in and of itself impose any obligation" to develop any technologies or grant licenses, and (b) the four July Assignment Agreements were "dated . . . after the Assignment Agreement [i.e. the 1999 contract] . . . [and thus] are void and of no effect."

Plaintiffs dispute Centrus' position re the voiding of the four July 2004 contracts. Plaintiffs (i) point to "extensive licensing negotiations" between the parties on this issue during which Centrus "never once asserted" that the four July assignments were voided;(ii) refer to the affidavit of Dr. Eden dated September 21, 2011 filed in this proceeding in which Dr. Eden denies any intent in the August 2004 Agreement to "extinguish" any "rights or obligations" in the July 2004 Assignment Agreements; and (iii) assert that in any event, the 1999 contract and the 2002 Clarification Agreement cannot be construed together to "prospectively nullify any such agreement [like the July 2004 Agreements] that might be executed in the future."

Whatever else may be argued about this issue one way or the other, it is not ripe for summary judgment.

*Conversion claims*

Centrus asserts claims for statutory and common law conversion, contending that the claims are entitled to summary judgment. Centrus argues ". . . liability for statutory and common-law conversion necessarily follows the conclusion that the Edens have breached their contracts with Centrus . . . Edens breached their contracts when they assigned to Centrus all technology,

7

improvements and related know-how underlying the BioSys System and then incorporated that same intellectual property into the BioLumix instrument."

Since Centrus' motions for summary judgment for breach of contract are herein being denied, the motions for summary judgment for conversion must perforce fail.

*Decision*

Centrus' motions for summary judgment re Counts VIII, IX and X in Plaintiffs' Second Amended Complaint and Counts 30, 33, 35 and 36 in Centrus' First Amended Counterclaim are DENIED.

/s/ James F. Davis

Special Master/Arbitrator

Dated: October 27 , 2011